19-2016 Digital Drilling Data Systems v. Petrolink Services 19-2016 Digital Drilling Data Systems v. Petrolink All right. Is it pronounced Mr. Leyendecker? Excuse me. Actually, that is the correct pronunciation. I've said Leyendecker my whole life. Leyendecker. Okay. We're all set. Kevin Leyendecker represent the Appellant Digital Drill. I intend to focus on two issues today. The first is the qualitative importance component of the substantial similarity analysis on my copyright claim. And the second is the effective control aspect of the DMCA claim. So let me start right in on the qualitative importance issue. And that is, as the court knows, substantial similarity is a test of both the quantity and the quality of what was copied. In this case, how much quantity and the qualitative importance of the schema that was copied. Did you make an argument below about the qualitative importance of the schema to the district court? I did in the context of my motion for summary judgment. But I mistakenly concluded in my motion that the only thing that mattered was that there was an exact duplicate of what was copied. So I erroneously in my motion did not address the qualitative component in the context of my motion, which was denied. Okay. So you didn't make that argument. So why are you relying on it here? I'm relying on it here because in the trial court, the Petrolink filed a summary judgment motion where they did not raise the comparison of the offending work, the scraper, with the data logger program. Instead, in their motion for summary judgment, they raised the comparison between the Petrovault software and the data logger software. That's the wrong comparison. And so the trial court decided, she decided sui sponte, the question of substantial similarity. And I was never on notice in the context of Petrolink's motion that there was an issue as to the qualitative importance in connection with the comparison of the scraper and of the data logger program. So that issue was decided sui sponte, which I raised in a motion for reconsideration, but my position is it was not waived, and the denial of my summary judgment motion is really irrelevant for this purposes. Okay? Okay. I understand. Thank you. All right. So back to qualitative importance. And when we're talking about qualitative importance, I mean, there's some technological concepts that are a little difficult. You must know them well. But we're talking about the qualitative importance of data logger's schema. Correct. And particularly what would help me would be, can you give a record site to anything that shows a side-by-side comparison in terms of, was the schema essential for the extraction of the drilling data or not? It absolutely is. The schema, in the simplest sense, is the road map. It's the living road map to the data that is then used to geosteer a well. And let me try to explain that. Data logger has 25 tables and 400 fields. That's the schema at large. The organization of that schema is what gives rise to originality. Here, there were two tables copied, the survey table and the gamma table. And in particular, I'll focus you on the survey table. Two of the fields that were copied from the survey table are the TVD field, total or true vertical depth, and the is deleted field. And let me tell you why they're important. The main thrust of data logger is to assist a driller or an operator to get into the well, to get into where the pay is. The true vertical depth, as it is mapped by data logger into the databases, varies from well to well. It is not static. Data logger tracks this data every 10 seconds or minute if you chose a minute. And every 10 seconds, there's a new row. Think of the table as a spreadsheet with rows and columns. And so on row one, the survey table is inputted with the correct or the incorrect data. And 10 seconds later is row two. 10 seconds later is row three, all the way down. Among those fields is the true vertical depth field. Part of each row includes the is deleted field. And that field tells the program whether the row in question is accurate. So that when data logger calls by the user to see what is the accurate survey information, it goes and looks for a record, might be on row 30 on this well, row 30, row 80, row 100, row 500, whatever it is. There are thousands. It goes and looks for the row or the rows where the is deleted field has been invoked to identify accurate true vertical depth. That's helpful, but I just want to make sure I understand. When we're talking about qualitative importance of these portions of the schema, do we mean qualitative importance as to data logger or as to PetroLink? It's actually qualitatively important as to both. Well, but what is the right inquiry with respect? It's as to data logger. As to data logger. Yes, Your Honor. As to data logger. So where is the evidence that these portions of the schema that were copied are important? I understand why they're important to PetroLink. Why are they important to data logger? You'd find that, I don't have the citation in front of me, but that's going to be in Mr. Benson's affidavits. There are two in connection with our papers from below. Both are cited in our briefing. The importance is, in order, once I start on the horizontal portion of the well and I'm trying to get into where the oil or the gas is, the drill string wants to drift up or drift down. And a geologist will tell you, I think that there's gas in the shale at, for example, 7,000 to 7,100 feet. And as I'm drilling in real time, that drill bit is going to want to drift up a little bit or drift down. And the TVD, as an example, knowing what the accurate TVD is in real time tells you, let me adjust and push it back into the middle of the pay. But isn't that just still the relevant data is the corrected drilling data? Or does it encompass the field and what I think of as just the organization of the data? It's both, Your Honor. Mr. Benson, you're being clear too, but he'll be very clear. It is absolutely clear. You cannot geos... Here's the thing. It's like if I say, well, there's a treasure, there's something valuable buried over there. Obviously, we can understand how that has value. But it's the map that gets to that that creates even more value in what's buried somewhere. And so there are, as I say, 400 fields across 25 tables. Enormous amounts of information is generated by data logger, 90% of which is used to geosteer. And that 90% is created by the schema that was copied. Created by? It's embodied, right? It's embodied by and you can't either... Data logger cannot go back and find the accurate data necessary to geosteer unless it has that living map that is created through the schema. The schema tells it where in the table. Is it in row 30, row 38, row 400, row 5,000? And it's the ability to go back with that living map and identify where is the correct data that then gets supplied to the operator. But without that living map that is created only because the dongle is inserted and it's interacting with the interface process, that's the only way that the data can have value to data logger. Otherwise, I've just got... It would be the equivalent of putting all of my files, my correspondence, my pleadings, my orders in one filing cabinet. To go back and find something would be extraordinarily difficult. But once I have an organization where I can go find the data that I need, that's why that schema has value to data logger. Pure and simple. And that's why when Petrolink says at page 30, I think 7 of their brief, the schema is static. You don't need the dongle inserted. That is factually incorrect. The schema is not static. The location of the accurate and necessary survey and gamma data to geosteer well can only be found by virtue of the living treasure map, if you will, that gets created in real time by that schema and the data logger process. So that's qualitative importance. Effective control. This is the DMCA? Yes, Your Honor, DMCA claim. Effective control. The definition contemplates effective control, two important concepts in the ordinary use as intended and with the authority of the copyright owner. The cases that Petrolink are relying on, the Lexmar case out of the Sixth Circuit and the Blizzard case out of the Ninth Circuit, essentially stand for the proposition that there's no effective control if you've got a house with two doors and you put a lock on the front door and there's no lock on the back door. And the lynchpin of Lexmar, which they cite in their brief, is that other avenue has to be readily, if the other avenue to get inside that house is readily accessible, then it matters not that you put a lock only on the front door. Okay? Here, there is only one door. It's the dongle and the interface process. There is no back door, or at least there was no back door until Petrolink wrote a program and then put that program on our customers' machines. So Lexmar and Blizzard, which are founded on this idea that a back door is readily accessible to the protected work, is simply not present in our case, but for their having put it there. The second distinguishing factor of those two cases is that the person who accessed the back door was the licensed user. In the Lexmar case, that's the person that purchased the computer printer and with that printer in their house or their office, accessed it and figured out a way to do whatever they were going to do. And in the Blizzard case, it's the licensed users who were interacting with their own machine to run this computer program in a way. Here, the licensed users are DigiDrill's customers. That is not the person who added the back door that didn't exist. Talk to me about, I have a feeling on the other side we're going to hear about the Firebird open source platform. Is it correct to say that the district court concluded that the Firebird username and password, the default password, the use of that is not a circumvention under the DMCA? That is what the district court found. Is that pertinent here? It's not pertinent here because I have not appealed that basis of the ruling. Originally with the trial court, I said there are three technological measures, the password, the dongle, and the interface process. The trial court disagreed on the password and I elected not to pursue an appeal on that basis. But the existence of the password does speak to the question of whether the protected work, the schema, as it was embodied into the database was readily accessible because it's not readily accessible, both because a third party has no right to be on our customers' machines and because there was a password. It may not have been very effective, but the test for effective control matters not on whether it's effective enough to prevent somebody from getting in there and doing what the statute is designed to prevent. Effective control, the question is whether it functions to control access to the protected work. It may have been clear in your brief, you're not appealing. I thought there was a live issue with district court split as to whether obtaining a password and using a password could be bypassing or avoiding control. Your argument is the obfuscation infrastructure argument and the dongle argument? That is correct. I made the decision because, whatever reason, I made the decision that there's a split in the passwords and I just felt the other two were very straightforward and I thought clear as could be in terms of a technological measure that effectively controls. Okay. All right. Well, your time's running out, so you just keep going because this is informal. Go ahead. On the dongle, there is a static quality to the schema alone. No? There's not. That's my point. I know, but I thought you could access the schema separately and later and that was the district court's observation that the portion that is copyrightable is something that's accessible to the public. It's not accessible to the public. It's accessible to our licensed users after the fact. The point of the data logger program is to assist operators in geosteering in real time. It doesn't do them any good to go look at what the true vertical depth was an hour later or three hours after I passed it. Go ahead. Keep on with your argument. Okay. So the fact that it's accessible after a well has been drilled is irrelevant. Effective control is measured in the ordinary course of the operation and the ordinary course is during drilling operations. So the true test is not whether it can be accessed statically after as a standalone file, like I might look at a word file on my iPhone. I understand that. On obfuscation infrastructure, which is a mouthful, is there a case law that suggests that the simple fact that it took Petrolink a long time to get in itself proves that there was obfuscation infrastructure? I don't have a case directly on point, Your Honor. I think when you look at the definition of what a technological measure is under the DMCA, both the dongle and you can find that definition is a technological measure effectively controls access to a work. If the measure in the ordinary course of its operation, and that's what I'm saying during drilling operations, that's the ordinary course, requires the application of information or a process or treatment with the authority of the copyright owner. So you have to insert the dongle. You've got to pay for a license to get a dongle. You have to insert it. Once the dongle is inserted, the application of a process is the interaction between the dongle and the interface process constantly checking, constantly embodying, oh, show me the accurate surveys. Go find them with what I've said is the map or the schema and bring it back to the user so we can see where we are. Do we need to adjust down or adjust up to get where the pay is? Now, I'm going to ask about preemption. I know. I was wondering what we're going to do about that. Yeah. So I know you're running out of time, but maybe the presiding judge will give you some grace there. I don't know. But on the preemption point, which is the cross appeal, now, I want to understand your argument. Is your argument that a Texas unjust enrichment claim, unjust enrichment claim does not require wrongful conduct? I just want to understand your view of Texas law on this. No, I think taking an undue advantage of somebody is wrongful conduct. If by that question, Your Honor, means a violation of a statute, it does not require a violation of a statute or of a law. But if it requires wrongful conduct, why aren't you in the world of global range, globe ranger, and the decision you know that I was on, the Thermotech case, where this jury was specifically told, you need to find an extra element, undue advantage, wrongful conduct. The extra undue advantage is not an element to the copyright claim. But this jury was told that it had to find that. Because under the Heldenfels case, I'm out of time. No, absolutely keep going. In Texas, the Texas Supreme Court Heldenfels case cited in the papers establishes the elements of unjust enrichment. Fraud, duress, the taking of an undue advantage. Those elements are additional elements relative to a copyright claim, and therefore it is not preemptive. Okay, so that gets you by preemption, if that's correct. That is correct, yes, Your Honor. But you're saying also the wrongful conduct doesn't require the violation of a statute, doesn't require, right? So I guess you might get by preemption, possibly. That is correct. But doesn't that hurt you on the merits of the liability? No. Why not? Again, I'm out of time. May I respond? Why don't we have two minutes to each side. Okay. For one very simple reason. Okay. The question presented to the jury, did Petrolink obtain a benefit from digit drill by the taking of an undue advantage? The linchpin of that is that our license agreement with our customers prohibits the linking of a machine that's running Datalogger to any third-party machine outside of that machine. And so what Petrolink did, without any authority as found by the jury, was to put this backdoor in there to obtain our schema, the roadmap, and the data, link it to their servers, and then send it off so that they could sell it to our customers or compete with our customers for that. And the license agreement is between? Between the Datalogger licensee and DigiDrill. And it expressly prohibits the licensee from linking. You certainly have a claim against the people you have a contract with, right? I beg your pardon? You certainly have a claim against the company where the license runs to that company. You have a claim. I would, but that's not the party who took advantage and obtained an economic benefit by doing that. They were being paid directly by the operator for the directional drilling services. Petrolink came in here, took our schema, the map, and the data, and then used it to sell a service and made the money that I've described in the papers. So tell me why it's wrong. I understand your view, and I'll ask the other side, why isn't that unethical? Why isn't that wrong? Why is it wrongful conduct for purposes of unjust enrichment? It, as found by the jury, was not instructed by Judge Haynen as to a definition of what constitutes the taking of an undue advantage. Okay, why is it an undue advantage? Because they— They're not bound by the license agreement. Well, they're bound not to tortuously interfere with the agreement between my licensees. Why didn't you sue them for tortuous interference with contract? Well, because I believe the better theory was unjust—the better and cleaner theory was unjust enrichment, Your Honor. What's the best Texas case describing undue advantage? There really isn't one. It's Heldenfels that just describes it. This is the standard for unjust enrichment, fraud, duress, or the taking of an undue advantage. There's really very little case law on it. The undue advantage here is that interference with the relationship between you and your license. I'm out of time. May I ask one question? Of course. On the attorney's fees, and I'm sure they'll bring—probably bring that up when they have their time, where Judge Haynen declined to award Petrograd—Petrograd—Petrolink—I'm still in the Cold War. Petrolink— When you said Batesville, I thought Texas. My ranch is in Batesville, Texas. So sorry, Judge. I apologize. Petrolink attorney's fees because it said, well, each party prevailed. Well, they prevailed on the two federal claims, the copyright and the DCMA. But you prevailed on unjust enrichment by showing that the copyright law didn't preempt. Is that the basis you would use for saying, well, we prevailed on a federal claim too, the copyright, because you don't get attorney's fees for unjust enrichment in Texas, apparently. That's correct. But is that the way you're saying it's the same thing because it's in the realm of copyright? Not really, Your Honor. I think if you look at the essence of what the cases say as to when fees would be appropriately awarded, right? Unmeritorious claims, frivolous actions. Here, the trial court—I have a copyright. My scheme is copyrightable. There is exact copying. All right? The behavior was found to be unjust enrichment and the taking of an undue advantage. I think if you look at the essence of what the cases say when it's appropriate to shift the fees, they can't satisfy those factors. Texas cases and federal cases. The federal cases that talk about the elements that are necessary or a court should consider in deciding whether we should shift the fees and award the fees, if you look at the merits of that as described in the brief, I do not believe they come close to satisfying that because our claim was very meritorious, and the trial court, in my view, wrongly decided the substantial similarity question sui sponte. And for that reason, it would be inappropriate to have awarded any attorney's fees. So that's my point of view on attorney's fees. Thank you, counsel. Thank you. Mr. Heidler? May it please the court, Michael Heidler for the Appellee and Cross-Appellate Petrolink. And if your honors will indulge me, I'll go through the issues in the same order that Mr. Leyendecker presented them. I'll start with copyright, your honors. DigiDrill says that this 5% of database schema that Petrolink copied, while quantitatively very small, had so much qualitative importance to create a fact issue on whether Petrolink misappropriated a substantial element of DigiDrill's work and thereby committed actionable copyright infringement. But that argument overlooks the broader substantial similarity test that Judge Higginson referred to in his question. In the Nola Spice Designs case, this court explained that the quantitative and qualitative importance of copied material is just one factor the court considers when it compares the party's work side-by-side to see whether the defendant's work is substantially similar to the plaintiff's copyrighted work. And here, the district court did that side-by-side comparison. On pages 24 and 25 of her opinion, she wrote, the two works are quite different in multiple ways, including their content, function, purpose, and utility, and no ordinary observer would regard the works as the same. But I guess, as I understand the argument, he's saying that, particularly Mr. Benson, will say that there really isn't a small portion and a separate portion divisible. This schema is the only way you can make sense of all the rest of the data. Therefore, its originality is essential to do any of the drilling. So what they're overlooking is this court's teaching from Nola Spice Designs that when you do the analysis and you compare the parties' work side-by-side Right, but that was a bead dog. It was a bead dog. Much easier to understand. Yes. He addressed the issue here, the various verbs that are used, that without the schema, you can't extract. Without the schema, you can't populate. It's a living road map. It's a road map to that treasure. Okay, here is how the schema plays in. The way that any computer program interacts with this database is through a programming language called the structured query language. To communicate with the database using that language, the program has to tell the database, I want the data from this table in this field, or I want to add data to this table in this field. So to communicate with the database, you necessarily have to duplicate small portions of the schema. So that's how the schema plays in, but what's really important to their work is not the schema. It's the drilling data. Their marketing materials are in the record. They're undisputed. They tout the data logger program and this unprotected drilling data as being the key, most important parts of their work. So, I mean, those words you used are important. You necessarily have to use the schema to get access to any of that data. That's right, Your Honor. We can see that you do, but that doesn't mean that there's actionable copyright infringement any time that someone makes a query to a database. Anytime any program queries a database, it has to reference bits of the organizational structure. But that doesn't mean that there's copyright infringement every time a program accesses a database. One of the things that the court did in Nola Spice Designs is, I know it's a feed dog, but the court still applied the principle that you filter out unprotectable elements when you look to see whether the party's works are similar. And in this case, the data is what they say is most important to their work. They go on and on about how you need the data to geo-steer. Well, the data is not a protectable element of their work. The district court concluded on summary judgment that the data is factual under Feist and, therefore, is not subject to copyright protection. And they haven't challenged that holding from the district court in their briefs to this court. So, the data is not a protectable part of the work. That gets filtered out and excluded in the analysis. What we're left with is this schema, this small portion of schema that we copied. And there's no indication that that is an important part of their work. So, we think under Nola Spice Designs, applying the principles of that case, there's no substantial similarity here as a matter of law. Would you agree that Petrolink wanted this schema? I disagree. I strongly disagree. Why do you disagree? All of the value is in the data. We had no interest in the schema except for the fact that we had to name the columns that held the data we wanted. That's it. Once we had done that, we threw the schema out. It had no value to us. What this case has always been about is this factual, unprotected drilling data. But even the schema that we copied, in Nola Spice Designs, Judge Higginson, you referenced the bead dog and the bead dog's collar. And he said, because the collar had minimal originality, that counsels against a finding of substantial similarity. Well, the small portion of database schema that we copied here has similar minimal originality. The schema is the structure for the database, the organization of the database. The primary organizational property that we copied is the basic fact that survey-related data, or data about the location of the drill bit in space, goes in one place. And gamma-related data, or data about the rock formation, goes in another place. Okay, so two points. Counsel opposite helpfully drew our attention to the Venson Affidavit that is going to explain to us the importance of the schema. Explain to us how it's a living roadmap. I don't know if you're prepared to address that. Should I look at that? Should I look at something else? Here's how I would do it. I would look at the Nola Spice Designs case. Because the issue here is not whether the schema, taken as a whole, with all of its intricate relationships, is an important part of their work or has originality. The question they brought up, looking at qualitative importance, is whether the copied portions of database schema, those are the copied protectable elements, whether those portions are important, whether those portions have originality. And on the originality point, the structural property we copied, what data goes where, is both obvious, that you would take these two very different kinds of data and put them in different places, and it's disclosed by table seven and eight of the industry standard well-studied information transmission specifications. The column names that we copied, he mentioned the true vertical depth, TBD. These column names are largely obvious abbreviations for common industry terms, like TBD, like MD for measured depth, like NS for north-south. He mentioned the is deleted column. It explains how it works. That's functional. It tells whether data has been deleted. So the database schema portions that we copied have very minimal originality, and the database schema taken as a whole, even if it has enough originality to survive the minimal feist test for whether something can be protected, it's entirely functional. In the engineering dynamics case, this court held that the user interfaces in that case had the minimal originality to be protected by copyright because they had some expressive function. They were organizational and functional, but they conveyed some information to the user. The database schema here operates entirely behind the scenes. Nobody ever sees it. It's entirely functional and has no expressive purpose whatsoever. Counsel weighed a lot of emphasis on this sentence, the schema is not static. The schema is not static. So the data is not static. The data is what is updated every 10 seconds. A new row is added to the spreadsheet, if you will. But the schema, the record shows on page 103.54 to 55, paragraph 35, 103.62, paragraph 55, and 103.82. The database schema comes from a script file that is installed along with DataLogger and put on the computer. And whenever someone clicks the button in DataLogger to create a database, the DataLogger program runs the commands in that script file and creates the schema. So the schema is static, and of course, once they finish drilling and logging, it's static as well. So we would ask the court to affirm on the copyright issue because there is no substantial similarity. But an alternative basis to affirm is that this case shouldn't be judged under the substantial similarity test at all. It should be judged under the virtual identicality test that this court endorsed in engineering dynamics. In that case, this court explained that where a work has minimal originality, it's entitled only to thin copyright protection. And the court then cited a series of cases and secondary sources explaining that such a thin copyright can be infringed only by making a virtually identical copy of the original. You preserved that argument. The district court didn't go that route. The district court— The cases are more much simpler organizational frameworks. Yes. I agree. But if your orders—we don't think substantial similarity is even a close call. But if you think it is, we really should be analyzed under the virtual identicality test because this database is a—the schema is the structure for this collection of facts. So under the FICE decision from the Supreme Court, the schema is entitled to a thin copyright protection. And here, there's no work by Petrolink that is substantially similar to any work by DigiDrill. And there's no work by Petrolink that embodies substantial verbatim copying from any work by DigiDrill. The parties' works are just entirely different. The third basis to affirm the summary judgment on copyright before I move on to the DMCA is the waiver issue that you raised, Judge Duncan. In Petrolink's summary judgment motion, Petrolink asked the district court to grant summary judgment because Petrolink had copied only 5 percent of this database schema. And copying such a small amount of the work cannot be copyright infringement as a matter of law. If DigiDrill had thought that this small portion of database schema, while quantitatively small, had so much qualitative importance to create a fact issue on copyright infringement, they were obligated to raise that argument in their opposition to Petrolink's summary judgment motion. I don't understand that. Did the district court, however, go and do the qualitative importance analysis? The district court did look at the qualitative importance, absolutely. How does that play into a waiver issue? I mean, the district court did reach the issue. Well, the district court said that DigiDrill had not engaged with substantial similarity. That's what the district court said. And they didn't. They really emphasized that they had dealt with direct copying, that we had directly copied parts of their work, these fragments of schema. And so they had every opportunity. They were put on notice, had every opportunity to discuss the qualitative importance. If they thought the district court's analysis fell short, they could have explained. I mean, when I look through DigiDrill's briefing, am I going to only find that in a motion for reconsideration? It's in two places. It's in a motion for reconsideration. That's the main place where they raise it. The other place is they had a separate summary judgment motion that Mr. Leyendecker referenced, and that was on our affirmative defense of fair use. And if you read that motion, they did discuss the qualitative importance of the data. But this court's standard for waiver is, did they raise the issue to such a degree that the district court could rule on it? And here, the district court first dealt with copyrightability and decided what are the copyrightable works here. Then the district court dealt with infringement and held, as a matter of law, there's no infringement. So the court never reached their motion on fair use. We don't think they raised it to a degree the court could rule on it. So we would ask the court to affirm the summary judgment on copyright infringement. Turning to the DMCA, digital's technological measures, the USB dongle and the interface process of the obfuscation architecture, do not effectively control access to the database schema in the Firebird database files because those measures control access only to one route to the files. And that's the route that goes through the data logger program. Those measures do nothing to control the alternative route of access that allows third-party software applications to make direct connections to the databases. What's your, I mean, just focusing on the statutory language, what's your best case that would not support a finding of circumvention when it simply took weeks to get access to the data and it only became possible when you obtained a licensee's laptop with the dongle attached? What's your case that would say that's not enough for a circumvention? There's two issues on the DMCA, effective access control and circumvention. The technological measures, the dongle and the interface process. Were effective. That's the point you're pressing, correct? Yes, they were not effective control measures. What happened is we got a copy of the database file on an email, and it's a binary file. It's not clear what format it's in, so we don't know what to do with it. Once we learned that it was stored in the Firebird format, accessing it was no problem. We got it on our first try because we looked at the Firebird website, saw how to connect to a Firebird database, and used the password listed on the website. What's your response to their textual argument that a technological measure effectively controls access to a work if the measure in the ordinary course of its operation requires the application of information, et cetera? Sure, so this is their argument that this alternative route of access, this other door, either doesn't exist or you really have to be a hacker to figure it out. It's not in the ordinary course. It's not in the ordinary course. I would point the court to DigiDrill's own website. When they're outside of litigation, when they're talking to their customers, they say on their own website that their users, they're talking about ordinary customers, can directly access the open Firebird database file using off-the-shelf software products. And their vice president, Mr. Benson, identified that. You would say you're not one of the users. You don't have a license agreement, right? That's right, but the issue for the DMCA, one element is lack of authorization, but the issue for the DMCA is does it provide effective control? And if DigiDrill's users can make direct connections using third-party software, that's a door. That's an avenue. That's a route of access to the work. And that route of access was not controlled by any technological measure here. Their vice president identified the Microsoft Excel spreadsheet program, one of the most common software products on the market today, as an example of a third-party software application that can make direct connections to these databases through this alternative route. Now, DigiDrill also says that its technological measures effectively controlled access to the databases while a well was being drilled, controlled this alternative route while a well was being drilled. In June of 2015, this is right at the end of the time we were using this program to access the databases, their vice president stated in an email, it's uncontroverted in the record, that they had developed a mechanism that they could use going forward to stop third-party software applications. He named the Petrolink application. He named the Microsoft Excel application as an example of making direct connections to the database through this alternative route of access while a well was being drilled. If their technological measures, the USB dongle and the interface process, already controlled this alternative route of access to the Firebird databases, there would have been no need in June of 2015 to go out looking for a mechanism to do that. In truth, during the whole time we accessed these databases, there was no lock on that door. There was no technological measure that controlled that alternative route of access. And whereas in this case, a technological measure leaves one route of access wide open, it doesn't effectively control access to the work for the DMCA under the DMCA's language. So this is why Lexmark is your best case. We would point the court to Lexmark and the MDY case. In Lexmark, the court said if you have a house with a lock on one door, and MDY is the blizzard case from the Ninth Circuit, a lock on one door and no lock on the other door, then the DMCA wouldn't naturally extend to that technological measure because it doesn't effectively control access. In the MDY or the blizzard case from the Ninth Circuit, a case analogous to this one, that court held that the computer program did not effectively control access to the files on the computer because users could open those files using off-the-shelf software. And that was a video game. The blizzard had a video game. And in the game, the court gave the example of you might have a monster. And the monster would have a picture and the monster would have a roar or a sound the monster would make. The normal way that a user would interact with those files is by going through the video game. And when the monster came up, the picture would appear and the sound would play. But the Ninth Circuit said a user could also scroll through their computer and find those files that the game used and open them with another program. And that means that the access control measure of the computer program did not provide effective control to the work. Now, in its briefing, DigiDrill raises this other argument. DigiDrill says that its USB dongle and interface process effectively controlled access to the Firebird databases because the data logger program won't create the databases in the first place or write schema to the databases until someone plugs in the USB dongle, opens the interface process, and clicks the button to create the database. But that is exactly how those technological measures are intended and designed to be used. By their own design, they give the dongle to their licensee. The licensee plugs it into the computer, opens the software they're provided with, and clicks the button to create the database. And the database is then created on the file system at a location where, according to their own website, their users can access it using third-party software applications. I want to make sure you get to preemption. I mean, I want to ask you about preemption, but I don't want to prevent you from making your argument. I want to understand. Here's a real simplified version of the preemption question. Texas unjust enrichment. It requires taking undue advantage. That's an additional element, therefore not preempted by copyright. So if it requires taking of an undue advantage, and that adds something above and beyond what is required for copyright, there are cases saying that the undue advantage element requires violation of a law or legal duty. The Rooster case is an example that's cited in the briefs. There are cases that they cite that say generally there is a species of unjust enrichment claims that doesn't require any wrongful conduct. We think it has to be one or the other. We don't see any Texas cases saying that you can have an unjust enrichment claim where there's no violation of a law or legal duty, but there's some other sort of inequitable conduct or fishy conduct. In the Villarreal case that we cited, the court said that the conduct of the defendant may seem unfair to the plaintiffs, but that's not enough to go to a jury. In the Mayor's Court case that we cite from this court, the argument was made that the defendants had gamed the system for recording property transfers in Texas to get around the normal course when they would pay fees to the clerks, and this court said you had the right to do that. There's no duty in Texas law to— Right, but that's because the original data was with the clerk. Here the data you obtained was from the plaintiff. Here the data we obtained was on a laptop computer belonging to the MWD company, and we had permission from the MWD company every time we went on their computer to do that. They gave us permission to do that. There's no evidence in the record. They never told us that they had any license agreement that would forbid this. They were paying for that data. Just remind me, before the jury was instructed, it did have to find the element of undue advantage. Did you oppose that? We asked for an instruction that to find an undue advantage under Texas law, the jury would have to find that we violated a law or legal duty, and the district court refused that instruction. And you haven't appealed that? We have noted in our brief that we raised that. An appeal of that issue would get us a new trial, and we don't think it's a new trial point. We think it's a rendition of judgment point. I guess, you know, again, because I was on ThermoTech, I thought it was very significant whether or not Texas law, an element was given that was beyond the copyright element. That's right, the extra element. Yeah, I thought that was a test. That is the test. But the court doesn't do kind of a one-to-one mapping. Is there a grammatically different element? The court looks at the substance of the claim. And so the question is, what is the substance of their claim? Is it, as they say in their brief, a claim that we didn't have to do anything wrong as long as we copied the data without their permission or liable for unjust enrichment? They're not saying just copywriting alone. Copywriting could just be you take somebody else's product, you copyright it. But here you had to, according to them, tortiously interfere with the relationship, breach the relationship. That's the extra wrong. Well, they haven't alleged tortious interference. They haven't alleged that as a separate claim, but I suppose... If they're relying on that as an avenue to support this finding, there is no evidence to support tortious interference. We would have to have the intent to interfere. There's no evidence that we knew about this. There's a provision in their license agreement that they point to, and it doesn't say that... I thought there was trial evidence that you went to them first and tried to get a license yourself, and then you backed off and went through their claims. Their customers were already paying for this data, and their customers and Petrolink both work for the operator EOG. And EOG was asking for this data that they were paying for. So we didn't need to go to DigiDrill. We had it from EOG's other customer, EMD. One legal question on the preemption also. I'm sure you know the cases. GlobeRanger. In GlobeRanger, there is the statement our court said. If the intellectual property at issue is not subject to copyright protection, then obviously the Copyright Act would not preempt a state law cause of action protecting that uncopyrightable property. This is the first GlobeRanger opinion, I believe? Yes. After that, this court has, in Motion Medical, in Sphere, in UltraFlow, you know those cases, has made clear that when Congress decides... So you think that statement, which you know, is just an erroneous, not supported by a citation, it's just wrong? I think the court has evolved from that position. No, we should not. I don't think it's correct to say that if it's not subject to copyright protection, then it cannot be preempted. If I can understand your position on preemption, we obviously have to look at the elements of the Texas claim. But you want us to also say we have to understand the undue advantage part of the Texas claim by reference to the conduct alleged in this case? Because I think there may be some tension in our cases about to what extent we can look beyond just the sort of hornbook elements. So the element test, the extra element test, is a qualitative test, so it's not a grammatical test. You look to see, is the claim qualitatively different? In Alcatel, there was all sorts of bad conduct alleged, but there was no element that substantively required that bad conduct, so the claim was preempted. So that's really the question here. We think one of two things has to be true under the law. Either Maerskorp and Villareal and Shin mean what we say they mean, and they have to prove that we violated a law or legal duty. That saves them from preemption. But then they don't have any evidence to show that we did that, so they lose on no legally sufficient evidence. Or they can water down their claim so much that they have evidence to support it, and it doesn't really require any bad conduct, but then they're in trouble with preemption. And I recognize the tension between these two issues and the difficulty in making an eerie guess into Texas law on what that undue advantage element, what is the substance of it. The easiest way to dispose of the unjust enrichment claim is to hold that there's no legally sufficient evidence of damages. That's where they prove gross revenues. You're moving to another issue, and your time has run out. How about letting him address attorney's fees just real quick? Thank you, Your Honor. On attorney's fees, Your Honor raised a very good question. Assume that the court leaves the judgment as the district court had at first. If we prevail on the copyright and DMCA claims and DigiDrill prevails on the state law claim, we should be entitled to attorney's fees. And I'll cite two cases for that. Number one is the Fogarty case from the Supreme Court where the Supreme Court said for the Copyright Act for damages, it doesn't matter whether you're a plaintiff or a defendant. Everybody's treated the same. The second case is the Balsley case from the Sixth Circuit. In that case, the roles were reversed. So the plaintiff prevailed on a copyright claim, and the defendant prevailed on a state law claim. And the court said, we're going to award fees or analyze fee requests by both parties based on the claims that each party won. So plaintiff, you won. You're the prevailing party for the copyright claim, so you're entitled to attorney's fees for the copyright claim. Defendant, you're the prevailing party on the state law claim. Let's look and see whether state law provides attorney's fees for this claim. So here the roles are reversed. We prevailed on the copyright and DMCA claims. Digital prevailed on- But in prevailing on the unjust enrichment, they prevailed on no preemption by the Copyright Act. That's the source of my question. So the Copyright Act does seep in to you prevailing on the-I'm sorry- does seep in to their being able to prevail on the unjust enrichment. So it depends on what this court does with the unjust enrichment. We think that claim fails three different ways. We're assuming everybody-for the sake of this question, we're assuming. We uphold summary judgment for you on copyright and the other claim, but we uphold their award of unjust enrichment. So they have overcome a defense that we asserted under the Copyright Act, but in doing so they are prevailing on a state law claim. But they're prevailing on the state law claim in part because they're prevailing on the Copyright Act. I just think it's sort of federal law seeping into- It's seeping in. But the reason they would be the prevailing party on that claim is because they obtained some recovery, and they obtained some recovery under Texas state law and restitution. And so their entitlement to attorney's fees for the unjust enrichment claim should be based on Texas state law. Our entitlement to attorney's fees for defeating the copyright claim and the DMCA claim should be based on federal law. But then you have the court's discretion in awarding attorney's fees, and maybe that's what allows blending them together. But thank you. Thank you, Your Honor. Rebuttal order. Very brief, Your Honors. Engineering Dynamics, a case they rely on for the proposition that I should only get thin protection, founded on Feist. Feist has three facts, name, address, and phone number. You can organize those three facts six different ways. That order has 25 tables and 400 fields, billions of combinations, night and day. Engineering Dynamics says structure and organization of unprotected facts is thin. We are not talking about structure and organization of unprotected facts. It's the schema. It's the living roadmap. Okay, so that was a subsidiary alternative argument. Keep going. Yes. Off the shelf. Our website does say that. The test is the ordinary use of the product. No user, I believe you'll find that Mr. Benson Zaffoday, that has ever used an off-the-shelf product to access the database other than the data logger program. The ordinary use is the data logger program with the dongle interacting with the interface process. Nola Spice, Engineering Dynamics. This is out of Engineering Dynamics. To determine substantial similarity, the court should, quote, focus on whether the defendant copied any aspect of the protected expression. The aspect they copied is the critical living map of the schema to find the data that will allow you to geosteer well. It's not every aspect. It's not thin. For the reason I just said, it's any aspect. And in this case, the aspect that was copied is critical and you cannot geosteer without using that living map of where the accurate data is located as embodied by a digital data logger. Finally, the jury, they made all kinds of arguments about why the operator gave them permission, why my customer gave them permission, and insisted and obtained a question at the trial level as to whether their conduct was authorized, whether they had authority to do what they did, and the jury said no, and that's not being appealed. Thank you. That concludes the cases for today.